IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NEXUS 1, LLC and NEX-STOCK, LLC,    :
      *Plaintiffs*,    :
        :
      v.    :    **CIVIL ACTION**
        :    **NO. 23-0216**
STEPHEN SIDWELL and NEXII    :
BUILDING SOLUTIONS INC.,    :
      *Defendants*    :

## MEMORANDUM OF LAW

Plaintiffs NEXUS 1, LLC ("Nexus") and NEX-STOCK, LLC ("NexStock," and collectively with Nexus, "Plaintiffs") filed an Amended Complaint against Defendants Stephen Sidwell ("Sidwell") and Nexii Building Solutions Inc. ("Nexii," and collectively with Sidwell, the "Defendants") raising claims for Declaratory Relief, Fraud, Breach of Contract, Tortious Interference, and Securities Fraud.  Defendants filed a motion to dismiss all counts.  For the reasons that follow, Defendants' motion is granted in part and denied in part.

## I.    FACTUAL BACKGROUND

This action is a common tale of broken-down business relationships, alleged fraud, and millions in lost investment.  Plaintiffs claimed that Defendants sold false promises of a "viable, turnkey franchise business system for manufacturing panels as part of a modular building system that would revolutionize the construction industry."  ECF No. 50 ¶ 5 [hereinafter "Am. Compl."].  Instead, Plaintiffs griped, "[u]nfortunately, [Nexii] was a Theranos, not a Tesla."  *Id.*

### A.    Defendants' Courtship of Plaintiffs.

The beginning of this corporate love story gone awry started in October 2019.  Am. Compl. ¶ 36.  Sidwell invited John Wolfington to a pitch meeting in Philadelphia to encourage investment in Nexii.  *Id.* ¶¶ 36-37.  Sidwell described Nexii's product as a modular construction

1

panel system that uses a concrete derivative, enabling the panels to be "strong, lightweight, low-carbon, and fire and water resistant." *Id.* ¶¶ 38-39.  Sidwell represented that Nexii had highly accomplished board members and advisors, had opened two successful manufacturing plants in Canada, and had quickly and cheaply completed a Starbucks and Marriot hotel.  *Id.* ¶¶ 40-46.

After the investor pitch, Wolfington traveled to Canada on January 3, 2020 to discuss potential investment with Defendants.  *Id.* ¶ 50.  At this meeting, Sidwell allegedly told Wolfington that Nexii had a turnkey plant, with vetted features such as design, manufacture, equipment, assembly and operating procedures, $1.2 billion in its sale pipeline, proprietary software, accounting procedures, marketing, advertisement, and an architecture and engineering team.  *Id.* ¶¶ 55, 57, 61.  Sidwell also represented that Nexii would use a franchised plant model to scale the business, support ramp up of a certified manufacturing plant for 12-18 months, and sacrifice margins until Plaintiffs earn 30% return on equity.  *Id.* ¶¶ 51-52, 56.  To woo Plaintiffs to invest, Defendants provided financial models that projected average annual profits of more than $20 million dollars.  *Id.* ¶ 63.

Eventually, after extensive negotiations, the parties signed the "Nexii Certified Manufacturing Agreement" originally entered into on October 7, 2020, in which Nexii granted Nexus the right and license to own and operate a production facility in Hazelton, Pennsylvania to manufacture, sell, and install Nexii products.  *Id.* ¶¶ 73-74; ECF No. 50-7 [hereinafter "Manufacturing Agreement"].  Moreover, Plaintiff NexStock signed the "Share Purchase Agreement" on May 6, 2021, which purchased 68,315 Nexii shares from Michael Dombrowski—co-founder of Nexii.  ECF No. 51-3 [hereinafter "Share Purchase Agreement"].  As a condition to receiving Nexii shares, Plaintiff NexStock also signed the Shareholders' Agreement.  ECF No. 51-4 [hereinafter "Shareholders' Agreement"].  The crux of this case

arises out of these transactions.

**B.      The Parties' Relationship Troubles.**

After the parties entered into the contracts, the relationship began to unravel.  The Court

lists a few of Plaintiffs' grievances below, though an entire recitation of the events leading up to

this lawsuit is unnecessary for a disposition of the motion to dismiss.

- As Nexus began to outfit the manufacturing plant in Hazelton, Pennsylvania,

Plaintiff determined that Defendants' initial cost estimates were inaccurate.  Am. Compl. ¶ 77.

Consequently, the parties amended the Manufacturing Agreement on September 3, 2021 to bring

another investor to assist with start-up costs.  *Id.*  Nexii allegedly failed to provide, as required by

the Manufacturing Agreement, a workable plan layout, resulting in revisions, delays, and

significant demolition.  *Id.* ¶¶ 86-93.

- Sidwell failed to inform Plaintiffs of the numerous deficiencies with Nexii's work

for the Starbucks and Marriot projects, which took considerable time and cost to correct.  *Id.* ¶¶

45, 47-48.

- Plaintiffs claimed that Defendants misrepresented business deliverables such as

design, manufacturing, equipment, assembly and operating procedures, certifications,

prospective clients and sales, customer service, proprietary software, accounting procedures,

marketing, advertisement, employee training, and a competent architecture and engineering

team.  *Id.* ¶¶ 111-40, 158-85.

- Plaintiffs contended that the list of required equipment remained a moving target,

and oftentimes the equipment list contained unnecessary equipment or failed to contain

necessary equipment.  *Id.* ¶¶ 77, 94-99, 105.  Moreover, Nexii supposedly pre-negotiated

"favorable terms" for equipment purchases, but the prices were actually above market rates

3

because Nexii would get a rebate.  *Id.* ¶¶ 101, 106-09.

- Defendants supposedly pressured Nexus to underbid contracts with customers, resulting in millions in out-of-pocket costs for Nexus, which Nexii refused to reimburse fully. *Id.* ¶¶ 142, 197-200.

C.    **The Breakup.**

As a result of the numerous transgressions listed above, Nexus issued a Notice of Default to Nexii on December 6, 2022.  Am. Compl. ¶ 207.  Under the Manufacturing Agreement, a Notice of Default provides Nexii thirty days to cure a deficiency under the Manufacturing Agreement.  *Id.* ¶ 208.

After Nexus issued the Notice of Default, Nexii claimed that Nexus had failed to make certain payments.  ECF No. 51-2 at 12 [hereinafter "Defs.' Mot."].  As a result, Nexii sought to exercise its rights provided under the Manufacturing Agreement to temporarily take possession of the Hazelton plant.  However, Nexus refused to grant Nexii agents access to the plant.  *Id.*  In response to the lock-out, Nexii filed a lawsuit against Nexus in the Delaware Court of Chancery on December 15, 2022, which was subsequently removed to the United States District Court of Delaware.  *Nexii Building Solutions Inc. v. NexUS 1, LLC, et al.*, Case No.: 22-cv-01619-RGA (D. Del.) [hereinafter "Delaware Litigation"].  The Delaware Lawsuit sought injunctive relief to enforce Nexii's step-in rights to access the Hazelton facility, and monetary relief for defamation and harassment tort claims against Nexus, Wolfington, and Daniel Metzler (a part owner of the Hazelton facility).  *Id.*

Shortly after Nexii initiated the Delaware Litigation, Nexus terminated the Manufacturing Agreement on January 6, 2023.  Am. Compl. ¶ 212.  On January 19, 2023, Nexus filed this instant lawsuit.  After this lawsuit was filed, the parties attempted to mediate; yet, those

4

negotiations were ultimately unsuccessful.  Defs.' Mot. at 13.

Roughly a year after Plaintiffs filed this lawsuit, Nexii—a Canadian company—initiated reorganization proceedings in Canada.  Defs.' Mot. at 13; Am. Compl. ¶ 28.  The reorganization proceedings resulted in the sale of substantially all Nexii's assets and an order releasing Defendants of liability "in any way relating to or arising out of the assets, obligations, business or affairs of [Defendants]," except for "any claim arising out of gross negligence or willful misconduct on the part of [Defendants]."  Defs.' Mot. at 13-14.  The Canadian bankruptcy order was adopted by the United States Bankruptcy Court for the District of Delaware under Chapter 15.  *Id.*

After Nexii's bankruptcy was completed, Defendants sought to dismiss Plaintiffs' lawsuit for numerous reasons.  This opinion resolves Defendants' motion to dismiss.

## II.    LEGAL STANDARD

A defendant may move to dismiss a lawsuit for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  "To survive a motion to dismiss, a [plaintiff's] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  When ruling on a Rule 12(b)(6) motion to dismiss, this Court accepts Plaintiffs' allegations in their Amended Complaint and makes reasonable inferences based on the facts, in the light most favorable to Plaintiffs.  *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016).  This Court need not accept legal conclusions and conclusory statements in Plaintiffs' Amended Complaint.  *Id.*

### III.    DISCUSSION

Defendants seek to dismiss Plaintiffs' Amended Complaint for numerous reasons.  First, Defendants asserted that all the counts in the Amended Complaint are barred by the Canadian bankruptcy order, which was adopted by the United States Bankruptcy Court for the District of Delaware.  Defs.' Mot. at 15-17.  Second, Defendants argued that Counts I through IV are barred by the alternative dispute resolution ("ADR") procedures outlined in the Manufacturing Agreement.  *Id.* at 17-23.  Third, Counts V and VI should be dismissed because they are subject to the British Columbia forum selection clauses in the Share Purchase Agreement and Shareholders' Agreement.  *Id.* at 23-25.  Fourth, Counts II, IV, V, VI, and VII should be dismissed pursuant to the gist of the action doctrine.  *Id.* at 25-27.  And last, Count VII should be dismissed because there is no private cause of action under 16 CFR 436.2.  *Id.* at 27-30.

### A.  Plaintiffs' Claims are Not Barred by the Bankruptcy Court Order.

The Canadian bankruptcy order, subsequently adopted by a U.S. bankruptcy court, released Defendants of liability "in any way relating to or arising out of the assets, obligations, business or affairs of [Defendants]," except for "any claim arising out of gross negligence or willful misconduct on the part of [Defendants]."  Defs.' Mot. at 13-14.  Defendants contended that Plaintiff amended their pre-bankruptcy complaint to merely add the words "gross negligence" and "willful misconduct" to fall within the exception of the Canadian bankruptcy order.  Defs.' Mot. at 17.  But although Plaintiffs' Amended Complaint added language to emphasize Defendants' gross negligence and willful misconduct, this is not merely window dressing to fall within the exception of the Canadian bankruptcy order.  Plaintiffs alleged detailed factual allegations in the Amended Complaint that plausibly demonstrate Defendants' gross negligence or willful misconduct.  For example, Sidwell boasted about the Starbucks

6

project but neglected to disclose the significant expense to remedy numerous deficiencies in the work. Am. Compl. ¶¶ 44-45. In addition, Defendants supposedly misrepresented that they had signed other certified manufacturers, but actually Nexus was the only certified manufacturer that Defendants had ever signed. *Id.* ¶¶ 238, 246. Accordingly, Defendants' argument fails here.

**B. Defendant Nexii Waived the Manufacturing Agreement's ADR by Initiating the Delaware Litigation.**

Under the Manufacturing Agreement, the parties agree "not to commence any action before any court or other tribunal against the other in connection with this Agreement without following the dispute resolution process defined in this Section." Manufacturing Agreement at 74. The Manufacturing Agreement creates a graduating three-step resolution scheme before a party may commence legal proceedings. The parties must first attempt resolution through discussion, and if still unsuccessfully resolved, the parties must attempt resolution through mediation. *Id.* at 75. As a method of last resort, the parties must arbitrate "[a]ll disputes arising out of or in connection with" the Manufacturing Agreement. There is evidence that the parties attempted to resolve the matter through mediation but not arbitration. Defs.' Mot. at 13.

Defendants claimed that Plaintiffs lawsuit is subject to the ADR because the claims arise out of or in connection with the Manufacturing Agreement. The relevant question, however, is not whether the claims contained in Plaintiffs' Amended Complaint relate to the Manufacturing Agreement; they clearly do. Rather, the proper inquiry is whether Defendants waived enforcement of the ADR by initiating the Delaware Litigation before engaging in the ADR procedures.[1]

---

[1]  Moreover, the Court determines that the Manufacturing Agreement's ADR is valid and enforceable under applicable law. Plaintiffs' argument that the Manufacturing Agreement is void is unpersuasive. Thus, finding the Manufacturing Agreement to be a valid contract, the Court proceeds with the waiver analysis.

"Waiver occurs where a party has intentionally relinquished or abandoned a known right."[2] *White v. Samsung Elecs. Am., Inc.*, 61 F.4th 334 (3d Cir. 2023) (cleaned up).  To determine whether an arbitration clause was waived, a court assesses the conduct of the party who held the right, as well as the circumstances and context of the case.[3]  *Id.*  This Court preliminarily determines which specific claims in the Delaware Litigation might indicate waiver. The Manufacturing Agreement explicitly permits commencing a lawsuit for equitable relief, such as a temporary or permanent injunction, without having to engage in the ADR procedures. Manufacturing Agreement at 73-74.  So, Defendants' requests for injunctive relief in the Delaware Litigation does not indicate a preference for litigation over arbitration.

On the other hand, Defendants' harassment and defamation counts, Counts VIII and IX, asserted against Nexus, Wolfington, and Metzler in the Delaware Litigation do indicate a preference for litigation over arbitration.  First looking at Defendants' defamation claim, Defendants alleged that Nexus, Wolfington, and Metzler falsely stated that Nexii's product does not work.  *Nexii Building Solutions Inc. v. NexUS 1, LLC, et al.*, Case No.: 22-cv-01619-RGA

---

[2]      The parties seem to disagree initially on what law is applicable, though both do an incomplete job in briefing which law ultimately prevails to determine the enforceability of the ADR and waiver of the same.  Defendants contended that Delaware law applies because the parties agreed to arbitrate pursuant to the Delaware Rapid Arbitration Act and because the parties agreed that Delaware law will govern the Manufacturing Agreement generally.  Defs.' Mot. at 17-18; Manufacturing Agreement at 75, 78. Plaintiffs contended that federal common law governs the enforceability and waiver analysis because the Manufacturing Agreement falls under the jurisdiction of the Federal Arbitration Act ("FAA").  ECF No. 53 at 25-26 [hereinafter "Pls.' Resp."]; 9 U.S.C. § 2.
         But in Defendants' reply, they retreat from their stance that Delaware law governs whether the ADR is enforceable.  Citing a U.S. Supreme Court case and a Delaware District Court case that were decided based on federal common law, they argued that this Court may only assess its conduct and intent, not prejudice to the Plaintiffs, in an arbitration waiver analysis.  ECF No. 57 at 15 [hereinafter "Defs.' Reply"].  Thus, given Defendants' tacit waiver that Delaware law should apply, this Court uses precedent applying federal common law for the narrow purpose of determining whether Defendants waived the ADR by initiating the Delaware Litigation.
[3]      Plaintiffs argued that the "prejudice inquiry" under *Hoxworth v. Blinder, Robinson & Co.* is the applicable test to assess waiver, but the U.S. Supreme Court has stripped the waiver inquiry "of its prejudice requirement[.]" 980 F.2d 912, 925 (3d Cir. 1992); *Morgan v. Sundance*, 596 U.S. 411, 419 (2022).

(D. Del.).  Moreover, Nexus, Wolfington, and Metzler allegedly made false statements about Nexii's operations, trade, and business.  *Id.*  A factfinder in the Delaware Litigation would necessarily have to decide whether the verbal statements were indeed false.  In turn, that inquiry requires determining whether Nexii's products do not work as promised in the Manufacturing Agreement.  Thus, Defendants' defamation claim against Nexus does in fact arise out of or connect to the Manufacturing Agreement.

Although Defendants' harassment claim less clearly touches on duties arising out of the Manufacturing Agreement, it also indicates Defendants' intent to waive the ADR.  *Id.* ("Sidwell in a group thread with Metzler threatening to 'expose' Nexii to investors and prominent newspapers with false allegations about Nexii, its products, operations, and financial condition.").  In any event, Defendants' defamation count against Nexus is sufficient to demonstrate Defendants' waiver of the ADR.

Defendants set forth a series of arguments against finding waiver.  First, they argued that the Manufacturing Agreement mandates that any waiver of rights must be explicitly waived in writing.  Defs.' Mot. at 21; Manufacturing Agreement at 80.  Yet, a no waiver of rights clause does not preclude a court from a waiver analysis.  *Gray Holdco, Inc. v. Cassady*, 654 F.3d 444, 452 (3d Cir. 2011).  Moreover, Defendants protested that defamation and harassment are independent torts not bearing on the duties in the Manufacturing Agreement.  Defs.' Mot. at 22.  But as described above, Defendants' defamation count in the Delaware Litigation raises issues that touch on the parties' obligations set out in the Manufacturing Agreement.  In addition, Defendants argued that they cannot have intended to waive the ADR because Nexii filed the "defamation and harassment claims with the good faith understanding and belief that such claims were not subject to the ADR."  Defs.' Reply at 16.  But determining a party's intent to waive

their right to arbitrate does not require a smoking gun. The analysis permits consideration of circumstantial evidence to infer Defendants' intent. In this case, the Delaware Litigation evinces a preference for litigation over arbitration.

Therefore, by bringing the defamation claim in the Delaware Litigation, Defendants have acted inconsistently with the ADR procedures and intentionally abandoned their right to resolve issues related to the Manufacturing Agreement through such procedures.

### C. Count V is Subject to the Shareholders' Agreement Forum Selection Clause but Count VI is Not.

The Shareholders' Agreement contains a forum selection clause, stating "[t]he parties irrevocably submit to and accept generally and unconditionally the exclusive jurisdiction of the courts and appellate courts of British Columbia with respect to any legal action or proceeding which may be brought at any time relating in any way to this Agreement." Shareholders' Agreement at 32. The Share Purchase Agreement, to which NexStock is a party, contains an accession agreement whereby NexStock agreed to be bound by all the terms and conditions of the Shareholders' Agreement. Share Purchase Agreement at 12. Based on the forum selection clause, Count V is dismissed but Count VI is not.

#### i. Count V is Dismissed.

The conduct alleged in Count V falls within the bounds of the broadly worded forum selection clause. The clause states that "any legal action or proceeding . . . relating in any way to this Agreement" must be brought in the jurisdiction of British Columbia. Plaintiffs' allegation—that Defendants made several fraudulent representations to induce NexStock into acquiring 68,315 shares of Nexii stock—does indeed relate to the Shareholders' Agreement. The mere fact that the alleged fraud occurred before the parties signed the Shareholders' Agreement does not

exclude such conduct from the contractual language "relating in any way to this Agreement." Whether it was discussions, slide decks, investment dinners, financial theater, puffery, broken promises, misrepresentations, or whatever other interactions occurred to collectively form the basis of the parties' motivations to enter into the Shareholders' Agreement, pre-contractual fraudulent inducements are captured by the forum-selection clause. Therefore, contrary to Plaintiffs' arguments, Count V does relate to the Shareholders' Agreement.

In addition, judicial economy does not warrant overriding the parties' agreed-upon forum selection clause. Neither does a supposed "public interest," which Plaintiffs' posit as a ground for overriding a forum selection clause. Plaintiffs argued, without supporting authority, that foreign citizens reaching into the United States for investment opportunities should be held accountable domestically for common law fraud committed against U.S. citizens. However, a dearth of case law to support Plaintiffs' argument is conversely matched by a surplus of case law holding the reverse; namely, that upholding a forum selection clause negotiated between two contracting parties is generally in the interest of justice. *See, e.g., Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 66 (2013) (holding that "'the interest of justice' is served by holding parties to their bargain" in the context of a change of venue request involving signatories to a forum selection clause).

> ii. *Count VI Survives Because the Share Purchase Agreement is a Domestic Transaction and Parties Cannot Opt Out of the Securities Exchange Act.*

The Share Purchase Agreement is a domestic transaction that falls under the jurisdiction of the Securities Exchange Act. Moreover, if the Exchange Act is applicable to a transaction, then parties cannot avoid enforcement under the Exchange Act by contracting for a forum selection clause in a foreign country.

11

1.  <u>The Share Purchase Agreement is a Domestic Transaction.</u>

Count VI alleges a violation under Section 10(b) of the Securities Exchange Act, which makes it unlawful to "use or employ, in connection with the purchase or sale of any security" a "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Section 10(b) only applies to "domestic transactions." *Morrison v. Nat'l Australia Bank, Ltd.*, 561 U.S. 247, 265 (2010). The domestic nature of a transaction depends on the location of the transaction, not where the alleged misconduct occurred. *United States v. Georgiou*, 777 F.3d 125, 135 (3d Cir. 2015) (cleaned up) ("we consider not the place where the deception originated, but the place where purchases and sales of securities occurred. It is the location of the transaction that establishes (or reflects the presumption of) the Security Exchange Act's inapplicability."). The location of a transaction is determined by the point of irrevocable liability, or in other words, "where, physically, the purchaser or seller committed him or herself" to purchase or sell a security, "even if the formal performance of their agreement is to be after a lapse of time." *Id.* at 136 (quoting *Absolute Activist Value Master Fund Ltd. V. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012)). The following facts are helpful in determining the point of irrevocable liability: "formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Id.*; *see also Absolute Activist*, 677 F.3d at 68 (noting that the location of the broker for the transaction does not unequivocally determine where a contract was executed).

The facts surrounding the stock purchase demonstrate that irrevocable liability occurred in Pennsylvania. Wolfington signed the Share Purchase Agreement and wired the funds to Nexii while he was in Pennsylvania. Pls.' Resp. at 42. Per *Georgiou*, the stocks "were bought or sold . . . from entities located in the United States," and the parties incurred irrevocable liability at the

time Wolfington agreed to purchase stocks and wire money from Pennsylvania. *Georgiou*, 777

F.3d at 136 (citing *United States v. Vilar*, 729 F.3d 62, 76-78 (2d Cir. 2013) (qualifying multiple

transactions as domestic because "(1) some victims entered into investment agreements in the

United States; (2) another victim 'executed the documents necessary to invest ... in her own New

York apartment and handed those documents to a New York messenger'; and (3) one victim sent

the money required for opening her account from New York.")).  Defendants, however,

countered that the following facts indicate extraterritoriality: Nexii is a Canadian company;

NexStock purchased the stock from a Canadian individual residing in Canada (Michael

Dombowsky); the purchase price was paid in Canadian dollars; the transaction was facilitated by

a Canadian company; the transaction closed at a Canadian law office, which executed the stock

transfer; and Dombowsky was the last to sign the Share Purchase Agreement from Canada.

Defs.' Mot. at 24; Defs.' Reply at 23.  This Court does not deny the transaction's substantial

connection to Canada, but the Exchange Act's jurisdiction is not ousted by virtue of a

transaction's strong association with a foreign country.  Instead, the Exchange Act's reach is

circumscribed if irrevocable liability occurred outside the United States.  Not so here.

Wolfington committed NexStock to purchase Nexii shares when he signed the Share Purchase

Agreement and wired the money from Pennsylvania.  At that point, under *Georgiou* and *Vilar*,

the parties had committed themselves to the transaction.

    2. The Forum Selection Clause Cannot Avoid Enforcement of the
      Exchange Act.

  Finding that the Share Purchase Agreement is a domestic transaction subject to the

Exchange Act, this Court must next determine if the Act nonetheless permits parties to contract

out of (via a forum selection clause) the Act's enforcement in U.S. federal courts.  The Third

Circuit has not decided this issue, so this Court looks to other circuits for guidance.

The Seventh Circuit in *Exchange Actfarers Pension Plan v. Bradway* construed a Delaware statute, which authorized a forum selection clause in a corporation's bylaws, to not foreclose a lawsuit seeking to enforce rights under the Exchange Act. 23 F.4th 714, 720-24 (7th Cir. 2022) ("The Court of Chancery made clear that enforcement of a forum bylaw to foreclose a plaintiff from exercising her rights under the Exchange Act of 1934 would be inconsistent with the anti-waiver provision of that Act."). Moreover, the Court held that *M/S Bremen v. Zapata Off-Shore Co.*, a U.S. Supreme Court case holding generally that forum selection provisions in contracts are "prima facie valid," differs because it dealt only with a purely private contractual dispute and not a federal statute with a non-waiver provision as found in Section 29(a) of the Exchange Act.[4] *Exchange Actfarers*, 23 F.4th at 724-25; 407 U.S. 1, 10 (1972).

The Ninth Circuit in *Lee v. Fisher* determined that the parties' forum selection clause, mandating any derivative action or proceeding be brought in the Delaware Court of Chancery, did not waive enforcement of the Exchange Act. 70 F.4th 1129, 1139 (9th Cir. 2023). The Court reasoned that the parties' forum selection clause did not prevent a direct action in federal court to enforce the Exchange Act against defendants. *Id.* Therefore, the clause was not a functional waiver of the substantive obligations imposed by the Exchange Act. *Id.*

The facts in this case are more analogous to *Exchange Actfarers* than they are to *Lee*. The Seventh Circuit cautioned against a forum selection clause that would foreclose entirely a plaintiff's ability to enforce rights guaranteed under the Exchange Act. Here, the Share Purchase

---

[4]    Section 29(a) of the Exchange Act is a non-waiver provision, stating that "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this title or of any rule or regulation thereunder, or of any rule of a self-regulatory organization, shall be void." The anti-waiver provision prohibits waiver of substantive obligations imposed by the Exchange Act. *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 228 (1987).

Agreement's forum selection clause, which only permits legal proceedings in British Columbia for matters relating in any way to the Share Purchase Agreement, effectively blocks Plaintiffs from being able to bring an action in the United States to enforce the substantive obligations set out in Section 10(b). Moreover, the reason the Ninth Circuit in *Lee* found the parties' forum selection clause not inconsistent with the Exchange Act's non-waiver provision was because the plaintiff still had an available forum to enforce the Exchange Act's substantive obligations via a direct action in federal court. That is not the case here. If this Court were to uphold the forum selection clause for Court VI, it would result in a functional waiver of an available forum to enforce the Exchange Act—an outcome that both Courts in *Exchange Actfarers* and *Lee* worked hard to avoid. Therefore, the forum selection clause does not dismiss Count VI.

### D.  The Gist of the Action Doctrine Dismisses Count II, Partially, and Count IV.

Defendants seek to dismiss Counts II, IV, V, VI, and VII pursuant to the gist of the action doctrine. Defs.' Mot. at 25. Under the doctrine, all post-contractual allegations in Count II are dismissed and Count IV is dismissed. Counts V and VII are dismissed on other grounds. *Supra* Section C.i; *infra* Section E. Count VI is a federal statutory claim and cannot be dismissed under the doctrine.

Under Pennsylvania law,[5] the gist of the action doctrine dismisses tort claims where the true gravamen is breach of contract. *Bruno v. Erie Ins. Co.*, 630 Pa. 79, 112 (2014). The mere

---

[5]     Plaintiffs and Defendants disagree on whether Pennsylvania or Delaware law applies to claims related to the Manufacturing Agreement. But this disagreement is neither here nor there for Defendants' gist of the action argument. Defendants conceded that there is no salient difference between Pennsylvania's gist of the action doctrine and Delaware's bootstrapping doctrine, therefore obviating the need for a choice-of-law analysis. Defs.' Mot. at 25-26; *see also U.S. Claims, Inc. v. Saffren & Weinberg*, LLP., No. CIV.A. 07-0543, 2007 WL 4225536 n.8 (E.D. Pa. Nov. 29, 2007) ("Under both Delaware and Pennsylvania law, the 'gist of the action doctrine' bars tort claims arising solely from a contract between the parties."). Thus, as agreed upon by both parties, this Court will apply Pennsylvania's gist of the action doctrine.

labeling of a claim as a tort is not controlling; a court must look to the underlying claims and relationship between the parties to determine the true nature of a claim. *Id.* If the duty breached is created by the terms of a contract and would not ordinarily exist but for the contract, then the claim is for a breach of contract. *Id.* If the claim alleges a violation of a "broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort." *Id.* Even if parties have a contract between them, that does not automatically classify a claim as breach of contract. *Id.* at 114. A party that had obligations under a contract can still breach its duty under tort law. Id. ("the contract is regarded merely as the vehicle, or mechanism, which established the relationship between the parties, during which the tort of negligence was committed.").

> i.  *Count II's Fraudulent Inducement Allegations Sound in Tort.*

Count II alleged fraud. Am. Compl. ¶¶ 232-76. Plaintiffs' allegations in Count II can be separated into two categories: (i) fraudulent inducement prior to the signing of the Manufacturing Agreement, Shareholders' Agreement, and Share Purchase Agreement and (ii) fraud occurring after the signing of the agreements. For the first category, Plaintiffs claimed that Defendants misrepresented Nexus as a profitable "fully-vetted, tested and certified building system" prior to the agreements. *Id.* ¶ 236. Defendants also made pre-contractual representations that Nexii had signed other certified manufacturers and was negotiating with several others. *Id.* ¶ 238. However, upon information and belief, no other entity besides Nexus signed something similar to the Manufacturing Agreement. *Id.* ¶ 246. Moreover, Defendants dramatically embellished the success of its Starbucks project, omitting the facts that the project was not completed on time, that it was significantly overbudget, and that Nexii settled with the developer and general contractor of the project to avoid litigation. *Id.* ¶ 250. Similarly, the

Marriot project's success was misrepresented and overblown. *Id.* ¶ 251. For the second category, Defendants' fraudulent conduct occurring post-agreements, Plaintiffs claimed that Defendants miscalculated bid offers in proportion to the actual cost of the project, failed to sacrifice margins in favor of Nexus, and forced Nexus to buy unnecessary equipment. *Id.* ¶¶ 262-71; Pls.' Resp. at 25.

The gist of the action doctrine does not apply to events that occurred before the agreements because a claim of fraudulent inducement does not rely on the breach of a contractual duty. *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 217 (3d Cir. 2022). Defendants allegedly misrepresented that Nexii had signed with other certified manufacturers and misrepresented the success of the Starbucks and Marriot projects to induce Plaintiffs to sign the Manufacturing Agreement, Shareholders' Agreement, and Share Purchase Agreement. At the time of those representations, the parties had not yet executed those agreements. As stated in *Sodexo*, a "precontractual duty not to deceive through misrepresentation or concealment exists independently of a later-created contract." *Id.*

However, Defendants alleged fraudulent conduct occurring *after* the agreements are squarely rooted in those agreements. Unlike the general social duty to refrain from fraud, Defendants' duties to calculate bid estimates accurately, sacrifice margins, and recommend equipment purchases exist only in the Manufacturing Agreement. But for the Manufacturing Agreement, Defendants would have no obligation to perform these acts. Therefore, the gist of the action doctrine dismisses the Defendants' post-agreement conduct.[6]

---

[6]    Defendants for the first time in their reply brief argued that, pursuant to *SodexoMAGIC, LLC v. Drexel Univ.*, the integration clauses in all three agreements preclude Plaintiffs' fraudulent inducement claims in Counts II, V, and VII. Defs.' Reply at 11. Because Defendants raised this argument in their reply, Plaintiffs did not have an adequate opportunity to brief a response. Therefore, the Court will not consider Defendants' integration clause argument at the motion to dismiss stage. *See Alston v. Forsyth*,

ii. *Count IV Sounds in Contract.*

Count IV alleged tortious interference with a contractual relationship. Am. Compl. ¶¶ 289-99. Specifically, Plaintiffs complained that Nexii failed to timely and accurately provide project plans, architecture and engineering materials, and a viable product, resulting in cancellation, delay, and loss of projects and potential projects. *Id.* Plaintiffs described Defendants' conduct as "willful misconduct or gross negligence," but it is not the egregiousness of the conduct that transforms it into tort. The nature of a claim depends on the duty breached. In this case, Plaintiffs failed to identify a broader social duty owed by Nexii to Nexus to provide timely plans, architecture and engineering materials, or a viable product. Those duties arose only under the Manufacturing Agreement. Therefore, Count IV is dismissed.

### E. 16 CFR 436.2 is Not a Basis for Rescission of the Manufacturing Agreement.

Lastly, Plaintiffs request rescission under 16 CFR 436.2 of the Manufacturing Agreement. 16 CFR 436.2 is a regulation created under the authority of Section 5 of the Federal Trade Commission Act. It imposes an obligation on franchisors to "furnish a prospective franchisee with a copy of the franchisor's current disclosure document" before a franchisee signs a binding agreement.[7] 16 CFR 436.2(a).

Using Rule 436.2 as a predicate for Defendants' misdeeds, Plaintiffs claimed that the Manufacturing Agreement should be rescinded as a matter of public policy under Pennsylvania

---

379 F. App'x 126, 129 (3d Cir.2010) (citing authority that it is improper to consider newly raised arguments in a reply brief without granting non-movant opportunity to file a sur-reply).

[7]     At the June 30, 2025 hearing, Defendants argued for the first time that the Manufacturing Agreement did not create a franchisor/franchisee relationship, and so the regulation is inapplicable. Hearing Transcript at 38-39. Defendants raised a separate issue without providing adequate briefing or legal authority for the Court's review. In any event, the Court need not consider this argument and dismisses Count VII on the grounds provided in this section.

law.[8]  The Court views Plaintiffs attempt to incorporate Rule 436.2 into Pennsylvania public

policy as sidestepping the absence of a private cause of action to enforce Section 5 of the Federal

Trade Commission Act.  *See Polansky v. Trans World Airlines, Inc.*, 523 F.2d 332 (3d Cir. 1975)

(citing *Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 989-90 (D.C. Cir. 1973) (holding that the

Federal Trade Commission Act provides no private cause of action, and the FTC is the agency

responsible for enforcement)); *see also Vino 100, LLC v. Smoke on the Water, LLC*, 864 F. Supp.

2d 269, 281 (E.D. Pa. 2012) ("defendants' effort to incorporate into Pennsylvania public policy

the specific prohibitions and disclosure requirements of Rule 436 is in effect an attempt by a

private party to enforce the terms of Rule 436 against another private party.").

Even taking Plaintiffs' argument in good faith, Pennsylvania law would not void the

Manufacturing Agreement for public policy reasons.  Pennsylvania courts will "not enforce

contracts that have an 'evil tendency ... opposed to the interests of the public.'"  *Vino*, 864 F.

Supp. 2d at 280; *see also Hall v. Amica Mut. Ins. Co.*, 538 Pa. 337, 347-48 (1994) ("there must

be found definite indications in the law of the sovereignty to justify the invalidation of a contract

as contrary to that policy . . . Court[s] should not assume to declare contracts ... contrary to

public policy.").  In an attempt to stretch Pennsylvania's public policy justifications for contract

rescission to Rule 436.2, Plaintiffs cited to *Am. Ass'n of Meat Processors v. Cas. Reciprocal

Exch.* but fail to draw a similarity.  Pls.' Resp. at 45.  In *Meat Processors*, the Pennsylvania

Supreme Court explained that when a contract's term violates a provision of a statute or the

contract cannot be performed without violation of such statute, the contract's term is void for

public policy reasons.  *Am. Ass'n of Meat Processors v. Cas. Reciprocal Exch.*, 527 Pa. 59, 67-

68 (1991).  This matter is different.  In the Complaint, Plaintiffs alleged no specific section in the

---

[8]      Defendants impliedly accepted the application of Pennsylvania law for this argument, despite
arguing elsewhere that Delaware law applies to the Manufacturing Agreement.

Manufacturing Agreement that violated 16 CFR 436.2. Moreover, there is no indication that the parties could not have lawfully performed the Manufacturing Agreement as written. Instead, Plaintiffs alleged that Defendants failed to furnish certain documents and information prior to the signing of the Manufacturing Agreement, as required under 16 CFR 436.2. Am. Compl. ¶ 348. Failing to abide by regulatory disclosure requirements does not form a public policy basis for contract rescission, as set out in *Meat Processors*.

The court in *Vino* dealt with similar facts as presented here. The defendant in *Vino* asserted that the one of the plaintiff's agents fraudulently induced the defendant into a contract because the agent, in violation of Rule 436, did not disclose the projected income of a franchise store. *Vino*, 864 F. Supp. 2d at 279-80. The defendant in *Vino* unsuccessfully made the same unsupported public policy argument that Plaintiffs make in this case. *Id*. at 280 ("Defendants have not cited any cases or statutes suggesting that the public policy of Pennsylvania embraces Rule 436 or other regulations promulgated by the FTC."). Therefore, this Court finds *Vino* persuasive and reaches the same result.

Plaintiffs attempted to distinguish this case from the holding in *Vino*. They strained to remove Count VII from the scope of fraudulent inducement by asserting that fraudulent statements are contained within the Manufacturing Agreement itself. Pls.' Resp. at 45-46. Specifically, the *projected* net income and the equipment list, which was *subject to modification*, were allegedly fraudulent because they were "moving targets." *Id*. The contractual terms Plaintiffs cited as fraudulent explicitly include qualifying language (i.e., *projected* and *subject to modification*), and so the terms cannot be said to create fraudulent "moving targets." Aside from the apparent inaccuracy in characterizing these two contractual terms as fraud, accepting Plaintiffs' contention would take this claim out of 16 CFR 436.2 altogether. 16 CFR 436.2 is

concerned with disclosures prior to the signing of the Manufacturing Agreement, not the specific terms of the Manufacturing Agreement itself.  Plaintiffs cannot force a square peg into a circle-shaped public policy argument under *Meat Processors*, find themselves within the facts of *Vino*, and then try to twist themselves out of *Vino* by shying away from their Complaint's original grievance—that Defendants failed to make certain disclosures prior to the Manufacturing Agreement.  Unwittingly, Plaintiffs' assertion that they need "not rely upon any parole evidence to substantiate their fraudulent inducement claim" may attempt to distinguish their case from *Vino*, but it also undermines any claim based on a violation of 16 CFR 436.2, which depends on pre-contractual disclosures.  No matter which winding rabbit hole Plaintiffs' inconsistent analysis leads this Court down, the claim cannot proceed.

**IV.    CONCLUSION**

For the forgoing reasons, Counts IV, V, and VII are dismissed. In addition, Count II is partially dismissed. The remaining claims survive.

BY THE COURT:

HON. KAI N. SCOTT
**United States District Court Judge**

21